IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

B. DAWN McCARVER HILDEBRAND,
Daughter, Next of Kin and Administrator Ad
Litem of the Estate of Louise McCarver,
Deceased, B. DAWN McCARVER
HILDEBRAND and GEORGE S.
McCARVER, individually,

        Plaintiffs,

        vs.                     Case No. 03-1018-JTM

SUNBEAM PRODUCTS, INC., and
AMERICAN HOUSEHOLD, INC.,

        Defendants.

## MEMORANDUM AND ORDER

    This matter comes before the court on the plaintiffs' Motion for Partial Summary

Judgment (Dkt. No. 83).  After reviewing the parties' arguments, the court grants plaintiffs'

motion.

## I. FINDINGS OF FACT

    Louise McCarver was born April 2, 1923 and, at the time of the fire, was 78 years old.

Before the fire, Mrs. McCarver had a preexisting medical history which included two heart

attacks in 1975 and 1999 that had resulted in permanent heart damage and significant decreased

heart function although she had recuperated.  Dr. Louise V. Eberle III testified that even if Mrs.

McCarver's echocardiogram showed a 30 percent ejection fraction, she would still be left "pretty

functional... that would probably not limit her from any kind of activities." Mrs. McCarver had also sustained a stroke in 1993 resulting in some loss of function on the right side of her body although, other than driving, she continued to do the same things she had done before. Since 1997, Mrs. McCarver had been living with her daughter and son-in-law, Dawn and Stan Hildebrand. Before the fire, Mrs. McCarver ambulated with a walker, went to church, attended ball games, shopped, stayed at home alone, did laundry, watched the kids, could cook and bathe, was independent in her activities of daily living, was alert and oriented, could remember things, and could talk and converse.

On the morning of April 11, 2001, Mrs. McCarver sustained burns to her body while she was in bed. Mrs. McCarver was admitted to Stafford District Hospital in Stafford, Kansas on April 11, 2001, and remained hospitalized there until May 7, 2001. While at Stafford District Hospital, the burns were eventually diagnosed as second and third degree burns.

While at the Stafford District Hospital, Mrs. McCarver developed problems with fluid loss and worsening congestive heart failure, pulmonary edema, and bilateral basilar pleural effusions. While at Stafford District Hospital, Mrs. McCarver developed electrolyte abnormalities including hyponatremia, hypokalemia, low chloride, and hypoalbuminemia. Dr. Eberle testified that for burns of this severity, the biggest issue is fluid loss, which would complicate heart failure, as well as respiratory failure from fluid retention and pulmonary congestion. "These patients have tremendous volume in fluid losses and [need] volume to resuscitate to provide fluid replacement . . . But it's not unexpected as far as the initial treatment for burns that she would become volume overloaded . . . especially [for] someone with her reduced ejection factor." (Dr. Eberle Deposition, Dkt. No. 84, Exhibit 20, p.83, l.15 - p.84, l.7;

2

p.102, l.16 - p.103, l.2).  Dr. Eberle testified that Mrs. McCarver's pleural effusions resulted from the fluid treatment.

Dawn Hildebrand testified that before her discharge from Stafford District Hospital, Mrs. McCarver had so much fluid, was so edematous, and had so much trouble breathing that she was barely responsive and almost comatose which prompted the transfer to Hutchinson.  Mrs. Hildebrand is Mrs. McCarver's daughter and also a nurse.   Mrs. McCarver was transferred to Hutchinson Hospital on May 7, 2001, and remained hospitalized there until June 6, 2001.  At Hutchinson Hospital, Mrs. McCarver's treating surgeon estimated that she had 240 cm² of third degree burn over 4-5% of her total body surface.

On May 7, 2001, her treating surgeon, Dr. John Shaw, wrote in her records that, due to her age and the extent of her burns, Mrs. McCarver had an expected mortality rate of 83%.  In his deposition, Dr. Shaw revised that mortality rate down to 10-40% although 83% is what he told the family.  On May 16, 2001, Mrs. McCarver was transferred within the hospital.  Her discharge summary reflects her condition at the time of transfer to be "poor," her long term prognosis was "poor," and future transfer to a hospice was considered.  By the time of transfer to a specialty hospital in Memphis on June 5, 2001, Mrs. McCarver's condition had somewhat improved, she was eating 50% of her diet, and her condition and long term prognosis were upgraded to "fair." Upon admission to Select Specialty Hospital in Memphis on June 5, 2001, it was noted that she had "marginal oral intake," her "appetite is poor," she was "somewhat cachectic and emaciated," and was assessed as having "[p]rotein caloric malnutrition."  Mrs. McCarver's daughter-in-law, Marion McCarver, described her as "very weak" and "very sick."  (Marion McCarver Dep., Dkt. No. 84, Exhibit 18, p.35, l.21-24)

3

Her admitting physician, Dr. Eberle, testified that nutrition needs are significant in burn patients because they don't feel like eating but have increased metabolic needs from the injury. Dr. Eberle believes that her debility clearly arose as a consequence of her burns.

On June 20, 2001, Mrs. McCarver underwent split thickness skin graft reconstruction by surgeon Dan H. Shell III at Select Specialty Hospital. At the time of her discharge from Select Specialty Hospital on July 13, 2001, Mrs. McCarver's appetite had improved and she had made progress in physical therapy but could still not function independently. Dr. Eberle believed that she still was not medically stable and stated that "[t]he long term picture was things had not changed significantly." By the end of July or early August, 2001, the skin graft was healing, the burn wound was closed, and the burns themselves were largely healed. However, Mrs. Hildebrand believed that Mrs. McCarver remained compromised from the prolonged hospitalization and, shortly thereafter, "she started getting worse and started going downhill and there were other things and just complications of things that had happened all along." (Dawn Hildebrand Dep., Dkt. No. 84, Exhibit 17, at p.151, l.1-13) ". . . She had so much residual of all the things that had happened in the hospital and, right after that, she started taking a turn for the worse." (Id. at p. 155, 1.8-19)

From July 13, 2001 to July 26, 2001, Mrs. McCarver was transferred to St. Frances Hospital in Memphis for rehabilitation. It was during this period that her daughter-in-law, Marion McCarver, described as the "beginning of the end" as her health took a turn for the worse, she could not do a lot of things, and it was difficult to get her to eat. Mrs. McCarver was tired and weakened after the long ordeal, having "suffered so many setbacks from the burn and

the problems that happened subsequent to the burn . . [j]ust the domino effect of one thing happening on top of another, I think she felt so overwhelmed. . . .I think she was just so tired in her body and in her mind and in her spirit . . . she just began to shutdown." (Marion McCarver Dep., Dkt. No. 84, Exhibit 18, at  p.44, l.20-25; p.47, l.2 - p.48, l.21)

At the time of her discharge from St. Frances Hospital on July 26, 2001, Mrs. McCarver's discharge summary stated: "[d]espite intensive efforts of the therapy staff and the patient's physicians, she was unable to show significant progress during her rehabilitation stay."  On July 26, 2001, Mrs. McCarver was discharged to Kirby Pines Manor, a skilled nursing facility.  In the 7 - 10 days before Mrs. McCarver died, Dawn Hildebrand testified that her mother didn't want to eat or drink, "felt horrible" and was not as responsive or alert.  (Dawn Hildebrand Dep., Dkt. No. 84, Exhibit 17, at p.53, l.6-13; p.164, l.12-16)  "Her body just began to shut down" as she finally told her Marion McCarver, "my shopping days are over, I will see you in Heaven." (Marion McCarver Dep., Dkt. No. 84, Exhibit 18, at p.48, l.23 - p.50, l.13)

Mrs. McCarver died on September 5, 2001, and the cause of death stated on her death certificate was "geriatric failure to thrive" and "chronic renal failure."  Dr. Eberle was Mrs. McCarver's primary attending physician at Select Specialty Hospital in Memphis.  He is board certified in internal medicine and pulmonary and critical care.  His opinions, the veracity of which defendants controvert, are as follows:

(a) Dr. Eberle finds that older patients with chronic problems do not do well with burns because they do not have the capacity to recover from the burn injuries and, when complicated by chronic medical problems, it is ". . . very, very difficult for even survival." (Dr. Eberle Deposition, Dkt. No. 84, Exhibit 20, p.10, l.23 - p.11, l.14)

5

(b) Burns not only affect the skin but create a stress on many organs causing many complications including fluid loss and overload, infections, respiratory failure due to fluid resuscitation, renal failure from stress, and metabolic and electrolyte abnormalities.

(c) Mrs. McCarver's debility was related to the burns and the long hospitalization. "...For each day that you're in the hospital, laying in the bed, it's going to take one to two weeks to physically recover from that."  In Mrs. McCarver's case, her prolonged hospitalization and her underlying medical problems ". . . makes the potential for her to physically recover from her initial injuries difficult to remote." (Id. at p.72, l.3-18)

(d) Mrs. McCarver did better than he expected.  He was surprised she survived her initial injuries.

(e) However, during his treatment of Mrs. McCarver, her prognosis was "very poor." (Id. at p.10, l.7-9).

(f) "She did not have the capacity to recover [from] those injuries, even though her burns healed.  Most people that die from burn injuries don't die from the burns themselves. They die from all the complications related to them . . . and in her case I think her burns healed but she did not have the capacity to physically recover from the debilitated state that those injuries left her in."  (Id. at p.19, l.18 - p.20, l.8).

(g) "Failure to thrive" refers to not eating, not getting up and getting around, and giving up physically and mentally, but Dr. Eberle cannot say whether her body gave up or she gave up. (Id. at p.74, l.9-20).  In his experience in taking care of elderly trauma patients, it is not uncommon for them to develop failure to thrive and incapacity to recuperate. (Id. at p.75, l.11-16).

(h) "I thought her burn injuries did contribute to her ultimate demise.  I think it was the stress on her life that she never fully recovered from."  (Id. at p.15. l.23 - p.16, l.6) "I think it (the burns) shortened her life." (Id. at p.18, l.25)

(i) His ultimate opinions were:

> Q. Do you have an opinion as to a reasonable degree of medical certainty that the trauma of the burn sustained on April 11 , 2001, was the causing factor in this death?
>
> A. I believe that it was a causing factor in the sense that it was an injury from which she could never regain her functions again.
>
> And despite some improvement, her overall course was one of progressive decline. Even though she was stabilized and healed, she was not able to regain function back to independence or to her previous state and continued to do poorly. (Id. at p.109, l.21 - p.110, l.8)

Dr. Daniel H. Shell III is a plastic and reconstructive surgeon in Memphis, Tennessee, and was Mrs. McCarver's surgeon at Select Specialty Hospital.  He has been board certified in plastic surgery since 1983 and estimates that he has seen 300 to 400 burn patients.  His opinions, the veracity of which defendants controvert, are as follows:

(a) Following his surgery of June 20, 2001, Mrs. McCarver did better than he thought she would do.  She healed the skin graft.

(b) The doctors at Select Specialty were not at all positive about her recovery because she did not have much energy, could not eat well, and she never seemed to recover from the trauma of her burns.

(c) "A burn affects every organ in the body; the central nervous system, the circulatory system, everything is involved.  It is the trauma of traumas.  And older patients do not respond to injuries as do healthy 20, 30 year olds." (Dr. Shell Depo., Dkt. No. 84, Exhibit

21, at p.52, l.10-14) (emphasis added)

(d) As one gets older, people lose dermis and the ability to resist scrapes, cuts, burns or other trauma. The elderly have thinner skin so that a burn that would be a second degree burn on a 20 year old can easily be a third degree burn in a 70 year old.

(e) As people age they lose their ability to fight infection.

(f) The immune system is not as effective nor are organs such as the heart, lung, kidney and liver.

(g) Mortality rates for elderly burn patients are far greater. They used to almost universally die from burns but, even with improvements in care, and depending upon the burn center study, octogenarians with a 10% burn or greater, still have a 25% to 60, 70, 80% mortality.

(h) As to causation:

> Q. What are those opinions. . . .?
>
> A. Basically, I've said that I felt that given the severity of her burns, given the problems that she had and the sequence of events that followed, from my understanding, that I felt there was a definite relationship of cause and effect between her burns and her death.
> . . . .
> Q. Okay. Would it be in your estimation a direct cause or a contributing cause?
>
> A. Well, direct would have been to me a more immediate outcome rather than five months down the line.
>
> Q. Okay.
>
> A. Yes. So it would be hard for me to say that it was a direct cause. I think it was very definitely a contributing cause in that patient. She, in my opinion, never got over the burn.
>
> And I base that on her nutrition, her metabolism, her adrenal insufficiency, her

8

burn septics. I mean, you can look through her chart and see all these things that happened.

Would she not been burned when that happened? Well, you know, the odds are - - I don't think that they would have, but who knows. She had heart disease, other problems.

Burn patients go through a period of several months of what's called catabolism. And that's a state when the body basically is so stressed that it is fighting, minute by minute, to survive.

And it is a state where the body basically has to go into its reserves to respond. And by reserves, lean muscle is used for the body's own nutrition. The body basically feeds on itself, if you will, despite all the nutrition we can give it.

She was definitely, in my opinion, in a catabolic state. By looking at her lab values and following that when I was treating her, and then looking at down the line when she wasn't eating, etcetera, she never reached the state where she began to recover, in my opinion.

Q. Were the complications, though, that you just listed, rectified by the time you discharged her from your care and treatment?

A. Well, the burn wound itself was closed. That was my role. That's why I was asked to see the patient. So that problem in opinion had been resolved, but the other problems were ongoing, as far as her recovery.

Q. What problem was specifically, to your knowledge, ongoing as far as the recovery subsequent to the skin graft?

A. After the skin graft she still had protein insufficiency. She still had adrenal insufficiency. She still had preexisting myocardio problems, her heart problems, her lung problems. These were all still an issue. I mean, she had to recover enough to deal with these, and I don't know that she ever did.

Q. What records do you rely upon to offer the opinion that she was still having the problems you just mentioned? I know just because they're not in your chart, were there other things that you provided?

A. In the Select Specialty notes they talk about her nutrition, that she's not able to eat, that they're not able to get her balanced, which is very important.

With any healing process of recovery from a trauma, such as a car wreck, or a

burn, or any other trauma, you see that throughout her chart that she does not have nutritional status. It's inadequate.

They talk about the tube feeding her. They talk about her alimentation. They had to give her steroids to treat her adrenal insufficiency. I mean, these are all things that they had to do, that she was not able to do on her own.

Q. Uh-huh.

A. <u>So she required a lot of supportive care, even after that burn wound was healed, in order to get to what you call an anabolic state, which is basically when you turn the corner with the trauma.</u>

<u>That's when your body no longer has to rely on itself. That's when the body is able to use the protein you give it and metabolize and then it builds up, rather than going downhill. And I never saw in the chart that I saw - - read where she did that.</u>

Q. Well, I think there was a time, even before the second procedure, where she was eating well and her nutritional - -

A. There were days when her, quote, appetite was good. Then when you look at her lab, her protein was still down. I mean, it takes months, we're not talking about a day or two.

Q. Sure. Sure.

A. You know, it's a month by month process to recover and to build back what you're lost and the reserves and, etcetera. So - - (<u>Id..</u> At p.38, l.11 - p.42, l.18) (emphasis added)
. . . .
Q. (BY MR. HANSEN) Okay. Then the question that was - - you and I have talked about and was raised again by Mr. Schillings here a little while ago, your opinion concerning the relationship between the burn trauma and the ultimate demise of the patient you indicated that that was your opinion; is that correct?

A. This is my opinion.
MR. SCHILLINGS: Object to the form.

Q. (BY MR. HANSEN) Is that to a reasonable degree of medical probability, which is more probable than not as opposed to pure speculation?

A. I would say it is.
(<u>Id.</u> at p.66, l.3-15)

10

Q. Doctor, I've got to ask you the question, then. Here's the death certificate.

A. Okay.
(Document passed to the witness.)

Q. Look at the cause of death being geriatric failure to thrive and chronic renal failure. Does that in any way affect the opinions that you have expressed in this case?

A. Does not, no.
(Id. at p.73, l.8-17)

## II. STANDARD OF REVIEW

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgments as a matter of law. Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the court must examine all of the evidence in a light most favorable to the opposing party. Jurasek v. Utah State Hosp., 158 F.3d 506, 510 (10th Cir. 1998). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. Baker v. Board of Regents, 991 F.2d 628, 630 (10th Cir. 1993). The moving party need not disprove the nonmoving party's claim or defense; it need only establish that the factual allegations have no legal significance. Dayton Hudson Corp. v. Macerich Real Estate Co., 812 F.2d 1319, 1323 (10th Cir. 1987).

The party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.' " Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in Matsushita). The opposing party may not rely upon mere

11

allegations or denials contained in its pleadings or briefs.  Rather, the opposing party must present significant admissible probative evidence supporting that party's allegations.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986).

## III. ANALYSIS

Plaintiffs argue that they should be granted summary judgment as a matter of law because defendants have not produced evidence to rebut their claim of causation.  Defendants respond that they do not need their own expert on causation and that plaintiffs are improperly attempting to reverse the burden of proof in this case.  After reviewing the parties' arguments, the court finds in favor of plaintiffs.

Under Kansas law, causation is an essential element of a product liability claim and a prerequisite to recovery, whether the claim sounds in negligence or strict liability.  <u>See</u> <u>Wilcheck v. Doonan Truck & Equip., Inc.</u>, 235, 552 P.2d 938, 942 (1976) (holding, "regardless of the theory upon which recovery is sought for injury in a products liability case, proof that a defect in the product caused the injury is a prerequisite to recovery.").  The Kansas Supreme Court has defined proximate cause as "that cause which in natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury and without which the injury would not have occurred, the injury being the natural and probable consequence of the wrongful act."  <u>Cochrane v. Schneider</u>, 995 F. Supp. 1204, 1205 (D. Kan. 1998) (<u>quoting</u> <u>Davey v. Hedden</u>, 260 Kan. 413, 426, 920 P.2d 420 (1996)).  The burden to prove causation rests with defendant.  <u>Sell v. Bertsch and Co., Inc.</u>, 57 F. Supp. 1393, 1396 (D. Kan. 1984).

A party may also prevail if she shows that the defect in the product was the cause or contributed to cause plaintiffs' injuries or damages.  Kansas PIK 3rd 128.18.  <u>See, e.g.</u>, <u>Sharples</u>

12

v. Roberts, 249 Kan. 286, 816 P.2d 390, 397 (1991) ("caused or contributed to the injury");

Allman v. Holleman, 233, Kan. 781, 667 P.2d 296 (1983) (same).  Where there may be more

than one cause of an injury:

> The mere fact that a person receiving an injury has a predisposition to a certain
> disease, or in fact had such disease or condition, would not relieve one who was
> guilty of negligence from liability in damages if it is established that such disease
> or condition was aggravated or made more painful by reason of the injury caused
> by such negligence.

Knoblock v. Morris, 169 Kan. 540, 220 P.2d 171, 174 (1950).  See also PIK 3rd 171.43.  As

observed in one treatise:

> Aggravation injuries are compensable when they constitute a condition of
> deterioration of the plaintiff's health greater than that which would have otherwise
> existed or evolved as a result of the preexisting condition alone. This rule applies
> as well for persons who experienced injuries due to any particular susceptibility to
> injury. . . . .A tortfeasor . . .must take his victim as he finds him, even if that
> plaintiff has a "thin" or "eggshell skull" or other special sensitivity.

Minzer, Marilyn M. et al, Damages in Tort Actions §1500 at 15-4 (Mathew Bender 1997)

(hereafter "Minzer, Damages in Tort Actions").  Further, the doctrine applies when the wrongful

act hastened the victim's death and the pre-existing state of health is similarly not a defense.  Id.

§15.11[3] at 15-33.  See also Restatement (Second) of Torts, § 458 (1965) (defendant liable for

disease contracted by lowered vitality caused by defendant's acts.).

Defendants argue that plaintiffs have not show that the burns were the direct or proximate

cause of her death.  In support of this argument, defendants cite the testimony of Dr. Phyllis

Chang, who states that the burn wounds "were not the direct cause of [Mrs. McCarver's]

immediate demise" but rather her "poor nutrition contributed to her downhill course and ultimate

failure to thrive..." Further, they argue that Mrs. McCarver's burn injuries had been successfully

treated and healed.  Five months after the incident, Mrs. McCarver died, and her death certificate

identified the cause of death as "geriatric failure to thrive" and "chronic renal failure." With other ongoing problems in her health, defendants argue that at best the burn injuries may be classified as a "remote cause" of her death.

As a preliminary matter, the court agrees that the burden is on plaintiffs to show causation. If plaintiffs meet this burden of proof, then it demonstrates that there is no genuine issue of material fact and the issue may be determined as a matter of law. This is not the equivalent of reversing the burden of proof but rather meeting the burden of proof.

The briefs raise the issue of whether Dr. Chang's opinion is admissible. Under Rule 56(e), the court may exclude consideration of unsworn expert reports. Duplantis v. Shell Off Shore, Inc., 948 F.2d 187, 191 (5th Cir. 1991) (unsworn expert letter); Fowle v. C & C Cola, a Div. of ITT Continental Baking Co., 868 F.2d 59, 67 (3rd Cir. 1989) (unsworn expert report not admissible). For the purposes of this order, the court will consider Dr. Chang's testimony on which defendants heavily rely. However, consideration of this report does not assist the defendants' argument. The report states that the "burn injury was a contributing factor to [Mrs. McCarver's] eventual death," but that Dr. Chang could not determine "the degree of contribution that can be ascribed to her burn injury." While Dr. Chang attempts to controvert the issue of direct cause, she admits that the burn injuries were a contributing cause. Further, Dr. Chang admits that after a burn injury, patients require additional nutrition above the baseline. Her testimony indicates that the additional nutrition was a reasonably foreseeable consequence of the situation created by a defendant's alleged negligence. Minzer, Damages in Tort Actions, §15.12 at 15-38 to 15-49. See also Restatement (Second) of Torts, § 457 (1965) (additional harm resulting from efforts to mitigate harm caused by negligence).

14

Rather than helping defendants' arguments, Dr. Chang's testimony undermines defendants' remaining arguments.  Dr. Chang and the treating physicians agreed that the failure to eat and thrive related to her original burn trauma.  Since malnutrition was reasonably foreseeable, it does not break the causal chain.  The same is true for cognitive and emotional deterioration.  Where trauma is reasonably foreseeable as a consequence of the original injury, then the alleged tortfeasor cannot absolve himself of liability based on a break in the causal chain.  The passage of time and the death certificate do not assist defendant.  As late as July 26, 2001, the record indicates that Mrs. McCarver was struggling with her rehabilitation, even though her physical wounds may have healed.  The death certificate notation is not dispositive on the issue of causation.

Although defendants object to considering plaintiffs' treating physician testimony, the court finds this testimony admissible.  Plaintiffs designated their treating physicians as "Actor/Viewer or Percipient Expert Witnesses" and the filed endorsement stated that their opinions and conclusions were set forth in the medical depositions and the October 2004 depositions.  As treating physicians, these doctors can testify without a written report.  Fed. R. Civ. P. 26(a) advisory committee notes (1993).  They may testify as to causation, diagnosis, prognosis, and other opinions arising out of the treatment without any expert report.  See, e.g., McLaughan v. City of Springfield, 208 FRD 236, 42 (C.D. Ill. 2002); Kirkland v. Union Pac. R.R., 189 FRD 604, 608 (D. Nev. 1999); Riddick v. Wash. Hosp. Ctr., 183 FRD 327, 330 (D.D.C. 1998).  See also Davoll v. Webb, 194 F.3rd 1116, 1138 (10th Cir. 1999) (treating physician not expert from whom report is required if the physician testifies about observations based on personal knowledge, including treatment of the party).  Since defendants' counsel raised

15

the questions that are now being used in this motion, he opened the door for these opinions and cannot claim an absence of a report. <u>LaPlace Bayard v. Battle</u>, 295 F.3rd 157, 165 (10th Cir. 2002).

The court finds that plaintiffs have met their burden of showing causation. Defendants' arguments largely support plaintiffs' assertion that the burns contributed to Mrs. McCarver's death.  With no viable evidence of an intervening cause that breaks the causal chain, the court finds that Mrs. McCarver's burn injury was the proximate cause of her death.

IT IS ACCORDINGLY ORDERED this 11th day of October 2005, that the court grants plaintiffs' Motion for Partial Summary Judgment (Dkt. No. 83).


s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE